Case number 13-4356, Wheeling and Lake Erie Railway v. Brotherhood of Locomotive Engineers. Arguments not to exceed 15 minutes per side. Ms. Pave for the appellants. Good morning, and may it please the court, I will be reserving four minutes for rebuttal. I may. Thank you. Margo Pave here on behalf of the Brotherhood of Locomotive Engineers and Trainmen and Robert H. Lindsay. The district court's preliminary injunction order in this case must be lifted because the carrier did not and cannot show a likelihood of demonstrating that its action in running trains without an agreement conductor was even arguably justified by the party's trainmen agreement. That agreement contains a scope rule, and that scope rule has within it a crew consist provision which unambiguously requires that a conductor, which is defined in the scope rule itself as an employee quote, represented by the union, close quote, requires that such a conductor shall be on all trains that W&LE runs. Given this clear and unambiguous requirement, the carrier's contention that the agreement permits it to use managers, folks who are not within the scope rule, in place of conductors is plainly frivolous. Now, W&LE contends that the agreement is, in its words, silent on the issue of running trains without an agreement conductor when no agreement conductor is available, but that is simply not so. The agreement requires that the crew consist of all assignments, shall consist of not less than one conductor. If no conductor is available, the carrier is simply not permitted to run the train. This is therefore not like the APA versus ABX cases upon which the carrier relies very heavily. In those cases, the collective bargaining agreements were, in fact, completely silent on the matters at issue. In the 2001 ABX case, that had to do with searches. CBA didn't speak to it. In the 2005 ABX case, the issue was an independent medical exam before permitting a pilot to return to work. Why shouldn't the agreement be construed to deal with exceptions or emergencies as appropriate? Granted, it doesn't speak to that, but why don't we have to realize in life there are emergencies that occur? First of all, this was not an emergency. Importantly, this was not a situation, and in fact, the record reflects, and if you look at General Chairman Lindsay's declaration and the exhibits attached there too, this was not a situation where there were no conductors available. These were situations where the carrier felt it more in its interest to move things faster. They didn't want to wait, so they chose to use a manager. And the point here is whether or not the district court, or in all honesty, this court, thinks that the carrier was kind of dumb to agree to language that says all trains shall. The fact is that is the agreement they reach. And what that agreement does, basically the union secured a rule that requires the carrier to employ a sufficient number of conductors to be able to run its trains. The parties made a deal, and each side gets the benefit or the detriment of that deal. And the district court, and this court for that matter, simply doesn't have the authority to rewrite the deal because it may feel that it has too negative an impact on the carrier. Why is this not a dispute of grievance over an omitted case such as in the Burley? Because this isn't an omitted case. The language here is expansive. You cannot, and in fact I think we quoted cases, you cannot be more inclusive, there is no word in the English language, more inclusive than all. So the parties said all trains, if you want to run a train carrier, you've got to put a conductor on the train. So in fact this isn't an excluded case or an unmentioned case or an unincluded case. And in fact, the position that the carrier is taking would basically make it impossible for parties to draft collective bargaining language. Because one of the things that the carrier says is, well, it's silent because it doesn't say, and we really mean all, and then list all of the times when it might be difficult for the carrier, but we still really mean it. The parties said all, you can't be more inclusive. And the parties said shall, you can't be more mandatory. So while- What I suggest is that you should have had an express prohibition against using managers instead of arrested conductors. Well, here's the thing. Again, we have a scope rule, and the scope rule specifically says, it defines, and all scope rules, I mean the crew consist is part of the scope rule. And scope rules in contracts are specifically intended to define the scope of the work to be done by members of the collective bargaining unit. So you have a crew consist provision that says, all, the crew consist of all assignments shall consist of not less than one conductor. And you have that in the context of a scope rule that talks about the fact that the contract and these provisions refer to traymen, conductors, and brakemen represented by the union, except where otherwise specifically provided for herein. So, and again, we've cited cases to you that discuss the fact that the scope rule is intended to say, here's the work that union folk do. And so it is beyond frivolous for the carrier to say, well, the scope rule actually says, people outside the collective bargaining unit can do the work of collective bargaining unit employees. That is nonsense. I mean, there's no other way to put it. That's completely contrary to the point of a scope rule. And again, I think that when you, the point that you made, Judge Stranch, I think goes to the weakness of the carrier's argument. They are basically saying, even when you use language that permits of no exceptions, and by the way, where the carrier and the union wanted an exception, they said it right there in the crew consist rule, right? They say, all shall, and then it says, except no conductor or brakeman shall be called for light engines. So they were fully aware that all means all, and we better make it clear when we don't mean all. And they did. And they did it for one exception only. If what they had meant was, oh, and you know what? This also doesn't apply if for some reason the carrier would prefer to use a manager, that's okay. It doesn't even say it's okay if there's truly no conductor available. And again, that is not the facts here. The facts here were not unavailability. The facts were. What if there were a true emergency? What should the company do? I guess part of that would depend on what you mean by emergency, Judge Moore. Is a train blocking the tracks that amounts to a public safety problem? I think if you had a true public safety problem, if you were a freight train on a road that's also used by passenger rail and you need to, I think that you approach the union, you tell them why you're doing it. I don't think we would be here in that situation. But this was not that situation. And I do think that in theory, the contract says, not just in theory, the contract does say all. But again, I think if the carrier had approached the union in a true emergency situation where there was truly no one who could get there in time, when there was truly an emergency public safety setting situation, we wouldn't be here. But that's not the facts here. The facts here are that the carrier agreed to language. Basically, the carrier has to employ enough conductors to do its work. Does the record indicate to us at this point in time how many times the employer used management to substitute for the union members? Well, it's interesting in regards to their past practice argument. The carriers have said, oh, we have always ignored this requirement. We use managers all the time. But the record reflects, in their own complaint, they asserted that they run 16,000 to 18,000 trains per year, which makes at a minimum 48,000 in the three-year period prior to this. The record, they submitted declarations. They were able to cite only six instances. They say we have this established past practice. They cited six instances in those previous three years where the carrier ran a train using a manager in place of a conductor. And, you know, six out of 48,000 clearly isn't an established past practice. But more importantly, I think, the record establishes that the union was unaware even of those six. Was the union unaware of all of the six, or were there three that the union was aware of, or was in addition? My understanding is that the six that they cite was separate and apart from the three that we knew of. And when we knew of them, we immediately objected. And it should be pointed out that when we objected, the carrier said, oh, yeah, you're right, and pulled back. So, I mean, I think that gets to the speciousness of the past practice argument. Because, again, we recognize what the governing rule here is. The carrier has to provide an arguable, non-frivolous interpretation. That is not possible here. There is no way you can interpret this kind of plain, clear, all-enveloping language to allow managers to take the place of agreement conductors when you have a crew consist provision in the scope rule that says all trains shall have a conductor. So it is our position that this is not a situation where there's an interpretation issue to be presented to an arbitral board. This is, and admittedly, these are rare, right? It's a rare contract that is written this way. And, again, I think the district court was uncomfortable. Oh, the carrier got itself into a bind here. But just because it got itself into a bind, it agreed to that language. There's no non-frivolous interpretation that supports its view that a manager can replace a conductor. And I would like to reserve the rest of my time for rebuttal if I may. Thank you. May it please the court, I'm Ron Johnson here this morning for the railroad. I think the law is clear. It's dealt with in our briefs. I don't think there's any disagreement over what the principles are here for how you determine whether a dispute is major or minor, with one exception, which I'll get to, is concerning the railroad's reliance upon past practice. The union argues in their reply brief that the past practice, which, by the way, it's undisputed that the carrier on occasion would use managers as engineers or conductors. Is it also undisputed that when the carrier used those and the union became aware of it, it objected? Well, the union was always, in our view, aware of it. Where is your view reflected in the record? The view reflected in the record is that it's an open practice, that when a conductor is sitting next to a manager in the locomotive, there's no question that there's a manager there assisting as part of the crew. And contrary to what the union argues, the agreement is not policed just by the general chairman. General Chairman Davis, General Chairman Lindsey, they're not Wheeling and Lake Erie employees. They've rarely set foot on Wheeling and Lake Erie property. They rely upon their local chairman, who are working employees, to tell them when they think something is going on that violates the agreement. When you read their declarations, they say, when I learned that Wheeling and Lake Erie did this, or when I learned that Wheeling and Lake Erie did that. How did they learn that? They learned that from the union members, the 100 at that time, BLE members and local chairman, who report if they think there's an agreement violation. Weren't there affidavits that, when they learned in response to the affidavits that you submitted in this litigation, of other instances? There's no evidence in the record that they ever objected to the use of a manager as a conductor. There's no evidence in the record that they objected. And I think, aren't there letters in the record that say that it's come to our attention that you have run a manager as a conductor, and we object, we consider that a major violation? That was on September 13th of 2013. That was the first time they made such an objection, and that was the excuse for the strike. The record evidence shows this practice of using managers goes back more than 15 years, and they never raised any prior objection to using managers as conductors or engineers until September 13, 2013. Is there evidence in the record that you informed them of your use of managers? No, there is not, but we're not required to inform them of that. There's no requirement in the agreement that we contact them before we use a manager as a conductor. Even though there's a requirement in the agreement that every train shall run with a union conductor on it? Well, see, that's where the union is misrepresenting what the agreement says. Article 1 of the trainman agreement does not say that every train will be run with a union conductor. What it says is that every crew shall consist of a conductor. And then there's a process for how you call employees to be conductors. You first go to the regularly assigned trainman, and the craft of employees, the bargaining unit of employees that act as conductors is the trainman craft, and they have their own collective bargaining agreement. And in that, you first go to the regularly assigned trainman. If they're not available, there's what's called extra boards, and those are a list of employees to fill temporary vacancies. And if there aren't any of them available, then you can go to a furlough list if there are any furloughed trainmen, which there weren't in this case. And then it stops. It doesn't say where you go if there are no rested available trainmen to act as conductors. Now, an important concession that the union made in that September 13 letter by General Chairman Lindsey is he says in there, you can use engineers. You could have used engineers to replace conductors who are no longer authorized to serve. You meant by that union engineers, correct? Yes, union engineers. But the engineers are a separate bargaining unit. Ms. Pave here argued this morning that under the union's interpretation of the scope rule in the trainman agreement, it's nonsense, she said, nonsense to think anyone outside of the trainman craft could work as a conductor. Yet the union concedes that the company can call engineers, which are in a different, even though they're represented by the same union, they're not covered by the scope rule in the trainman agreement. They're covered by a completely different collective bargaining agreement and different work rules, and yet they never objected. Is that their response to the claim of an emergency? Well, the past practice is that we're not limited to an emergency. The practice that the record shows is that the first choice of the company is always to use union conductors, and if union conductors aren't available, they use union engineers, even though they're not covered by the same collective bargaining agreement. And even if they're not available, it's not every instance where the company has to move the train. But sometimes when you have a need to serve a customer, if you're blocking a main line, even if it's not an emergency, it's our view under the past practice that they can use. I'm struggling with the past practice argument that you're making. I'm looking at the statistics that your opposing counsel has suggested that six out of, or maybe nine if you count the other three, out of 48,000 runs, .00008% is what has been used under the evidence that's in the record. And I'm looking at the case law, the Detroit and Toledo Shoreline case, which I was rather conspicuously absent from your brief, but I got the impression from the beginning of your argument that that was what you intended to address. Yeah, let me address that because it's important to your analysis, Your Honor. Please. The reason why we don't talk about Detroit and Shoreline is it has no application whatsoever in a minor dispute. As the Supreme Court recognized in Conrail, the governing Supreme Court case is Conrail. Shoreline dealt with what is the status quo. But let me ask you, that assumes that it is a minor dispute. Weren't you in the procedures for a major dispute in this case? We were, Your Honor. However, just because you're in the dispute for a major dispute, just because you're in collective bargaining, that doesn't mean that every dispute on the property is a major dispute. And this court so held in ABX reported at 400 F. 3rd. 411. There, this court rejected the idea that just because the parties are engaged in a major dispute, that doesn't turn every dispute on the property into a major dispute. And if I may finish about the point on Shoreline, this court, as other circuit courts, have repeatedly held that Shoreline is simply inapplicable in a case like this where the issue is determining whether dispute is major or minor. And I refer the court to United Transportation Union versus River Terminal Railway Company, which is reported at 1998 U.S. App. Lexus 6647. And there, when the union tried to make a similar argument to here, this is what the Sixth Circuit had to say. But whether or not the list became a working condition is irrelevant to whether the dispute is major or minor. UTU, that's the union, reliance on Shoreline is misplaced because the issue of characterizing a labor dispute as major or minor was not before the court. The decision dealt instead with the RLA status quo requirement as applied to what all agreed was a major dispute. UTU conflates two levels of inquiry into one. The first is whether this dispute is major or minor, and the second involves the resolution of the dispute itself. So here the issue before the court is this dispute is major or minor. At this stage Shoreline has nothing to do because in Shoreline the court was trying to define what is the status quo that has to be maintained. And there is no status quo requirement in a minor dispute, Your Honor. As to the statistics, there's no statistics in the record as to how frequently the company uses managers. We know it's rare because that's the company's position. The opponent was saying that there were six instances plus the three where they objected. Where is the number six? Do you dispute that or not? I dispute that there are only six. So how did the number six come up? Well, the carrier's burden to show that the dispute is minor is relatively light, and you're in a hurry when you have a strike to put your papers together. So you don't have to put the entire case before the district court that you would put before an arbitrator. You just have to put in enough evidence to show that your argument is not frivolous. In this case we had declarations from managers who had worked for the company going back 20 years, Jim Hill, Andrew Lingle, and Lauren Dodds, who had originally worked as union engineers and union conductors and then got promoted into management. And they talked about their experiences of working with managers and then as managers working occasionally as conductors. So our evidence is that there's a more than 15-year past practice. To help support that, more recently we found time slips that showed six specific instances where we used managers as conductors or engineers. That wasn't our only evidence. Those were just six examples that we could substantiate beyond what the declarant testimony was. So there is no statistics that one out of 45,000 or whatever. We admit that it's rare. But that's the whole point behind a collective bargaining agreement under the Railway Labor Act. It doesn't necessarily comprehend every situation. It allows flexibility in the joints, and that's this type of situation. So your opponent's primary or at least initial argument is looking at the language of this particular provision, that it says the crew consist of all assignments shall consist of not less than one conductor and one brakeman. And there's no exception except for something specifically on light engines or engine. May I? Yes. So why is that not a blanket rule that has to be followed? We don't disagree with that, Your Honor. Where the disagreement comes is they insert the word agreement into the language. Article 1 says there must be no less than one conductor in every crew. We don't disagree. Our position is, though, if there's no rested trainment available to be the conductor, we can use other employees as that conductor. So conductor isn't defined anywhere in the agreement? That's correct, Your Honor. It's not defined as an agreement conductor. So in contrast to the engineer's agreement, the engineer agreement says engineer work will be done by employees covered by this agreement. That's not what the trainment agreement says. And, again, the union undercuts its own position that only trainmen can act as conductors with their admission in General Chairman Lindsay's declaration that the company uses engineers. Under their theory, a locomotive engineer who's in a different bargaining unit is just as much violating the agreement by operating as a conductor as a manager. But wouldn't your theory be then that anybody can be a conductor because the agreement doesn't say who is a conductor? So that you could be a conductor. Maybe you are trained, but using the you in a hypothetical way. To be a conductor, you have to meet certain certification requirements of the Federal Railroad Administration. So I don't think you or I could be a conductor. Now, an engineer can be a conductor because engineers are promoted from the rank of conductor, so they have conductor skills. But the answer is no, not just anybody can be a conductor. It's the carrier's position that the only people who can work as a conductor are first trainmen, then locomotive engineers, and then, if you can't find anybody in these exceptional circumstances, a manager. And I'd like to point out, if you listen to the... It has to be a manager who's been certified as a conductor, is that right? Right, right. Not every manager, there aren't that many managers at the Wheeling who are qualified to be engineers or conductors. So only those managers can fill in for a trainman or an engineer position. And again, we're only talking about temporary situations here. And if you listen to the debate we're having, it's our point that under the low burden of proof we have to show that this is a minor dispute, what we're debating about are terms in the collective bargaining agreement. Every decision by this circuit since Conrail where that debate has gone on has held that the dispute is a minor dispute. And the types of questions that you're asking me and Ms. Pave, those are questions ultimately reserved for the exclusive jurisdiction of an arbitrator to decide, not the courts. And help me understand why you were engaged in the major dispute resolution procedure on this very issue. Well, Your Honor, we're not engaged in the major dispute on this very issue. Well, you were before the NMB, were you not? And isn't that the major dispute resolution procedure? Well, the major dispute procedure is just another word for collective bargaining. The collective bargaining process is called major dispute. And the parties have been in collective bargaining to amend their agreements for two or three years now. And neither side in that collective bargaining has proposed any change to the collective bargaining agreements on the issue we're talking about. I thought there was something where the company had sought to make this change. No, Your Honor. What the company has proposed in collective bargaining is for certain trains to eliminate the need for a conductor completely and have the right under the collective bargaining agreement to operate certain trains with only an engineer, only one employee. That is an issue in the ongoing major dispute. But that's not the issue in this case, even though the union has tried to confuse things. There's a maxim in the law. If the law favors you, you argue the law. If the facts argue you, you argue the facts. If neither the law or the facts support you, you try to confuse everybody. And with all due respect to the union, they're trying to confuse the issue by arguing that this relates to the major dispute when it doesn't because we're not seeking to operate trains without conductors. Trains were operated with conductors. They were just management conductors in these instances. Thank you. Thank you. Thank you, Your Honors. With all due respect to Mr. Johnson, the only person trying to confuse matters here is Mr. Johnson. Let's start with all of these various things he tried to say in response to you, Judge Stranch. Nothing he said when he started going on about, oh, the CBA is policed by all these people. It's not on the record. Go back and look at the record. That's the first thing I would say to you right now because 73 percent of what Mr. Johnson just said to you, he's just talking. It's not in the record. What the record reflects, he talked about these managers who had 20 years of experience. And by the way, their declarations were not submitted in haste. Oh, my God, there's going to be a strike. They got a temporary restraining order. And then they filed a supplemental brief, and they submitted these declarations with that brief. They had lots of time for these managers with 20-something years of experience, and those managers could come up with, as you pointed out, six instances. And that's what they say is this established past practice. Also, as you inquired, none of those instances were known by the union. And the cases we cited to you make clear acquiescence, which is what you need. Knowledge and acquiescence is by the union. And in fact, I think it was actually a case that was authored by Judge Key that we cite. I think it's called Greenleaf Motors, in which basically this happened. The employer was doing something it was not permitted to do, started doing it in October of one year. Business agent didn't learn about it until May of the next year. The employer said, well, the employees knew what we were doing. The court said, too bad. That's not a past practice. That's not acquiescence by the union. Secondly, I think Judge Moore got to something that is very key. Their argument basically is we've got a scope rule that includes a cru consist rule. We have a collective bargaining agreement, right? By definition, it controls the work of collective bargaining represented employees, not managers. And again, we've cited cases that talk about managers are foreign to the collective bargaining agreement. What he's saying is as long as a manager has an FRA certification, we can run him, which translated means we can replace a collective bargaining unit member any time we want. Now, he's saying to you, well, but that's what it translates to. How can there be a non-frivolous argument that the parties agreed in the scope rule? And again, scope rules are specifically designed to protect work for collective bargaining unit members. How is the non-frivolous argument that says the union agreed in the scope rule? We can, someone could interpret this to mean that the union agreed we can replace agreement people any time with our managers as long as they have FRA certification. FRA certification is irrelevant here. What's relevant here is the plain language of the agreement. Similarly, I was stunned, look at the record, stunned to hear Mr. Johnson say, oh, this issue was not in a major dispute context. Go back to the record. Look at the Section 6 notices. Mr. Davis's declaration, Mr. Lindsey's declaration, they cite the Section 6 notices that the carrier served on the union, seeking to do what? Get rid of the language that says all assignments shall have a conductor. So, in fact, the very issue, and you asked it. That's Mr. Burley's letter to the National Mediation Board, is that correct? And it's in that letter, but it's also in the exhibits to Mr. Davis's and Mr. Lindsey's declaration. It's the notice saying this is what we want to bargain about. So, in fact, the parties were bargaining about this. The carrier was saying we want to change the agreement to let us do this, which means they can't do it until the agreement is changed. And instead they said, you know, we actually have a mediation about this in two days, but we don't feel like waiting. We're going to go ahead and do it again, even though we know the plain language of this agreement doesn't permit it, and six times out of 48,000 doesn't permit it. I see my time is over unless there are other questions. Thank you very much. Thank you, Your Honors. I appreciate your arguments from both sides, and the case will be submitted. Would the clerk call the next case, please?